IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| STEVEN POGODZINSKI, ) | |
| ) | |
| Plaintiff, ) | |
| ) | No. 16-cv-04236 |
| v. ) | |
| ) | Judge Andrea R. Wood |
| VILLAGE OF SKOKIE, ) | |
| SGT. G. GUTIERREZ, and K. IWANSKI, ) | |
| ) | |
| Defendants. ) | |

**MEMORANDUM OPINION AND ORDER**

In April 2014, Plaintiff Steven Pogodzinski was arrested for possession of a controlled substance while visiting the home of his friend, Ninous Zomaia ("Ninous"). Pogodzinski claims that his arrest was the result of a conspiracy between Defendant G. Gutierrez, an Illinois State Police officer, Defendant K. Iwanski, a Skokie police officer, and Ninous's family. Specifically, he asserts that the officers arrested him for possession of gamma-butyrolactone ("GBL") despite knowing that did not in fact possess GBL. Pogodzinski has sued Gutierrez and Iwanski under 42 U.S.C. § 1983 for alleged violations of his rights under the Fourth and Fourteenth Amendments to the United States Constitution. Now, Gutierrez and Iwanski seek summary judgment in their favors on all claims. (Dkt. Nos. 122, 124.) For the reasons stated below, the Court grants their motions.

BACKGROUND

The following facts are undisputed unless otherwise noted.

At the time the events underlying this action occurred, Pogodzinski resided in Wyoming, Michigan. (Pl.'s Resp. to Defs.' Local Rule 56.1 Joint Statement of Facts ("PRDJSF") ¶ 1, Dkt.

No. 135.) But he would travel from Michigan to Illinois every two months to visit his best friend, Ninous Zomaia, staying for a week or two at a time. (*Id.* ¶ 5.) Ninous was married to Nathalie Tachaba. (*Id.* ¶ 6.).

All parties agree that Ninous would consume "Liquid G," which is the street-name for either gamma hydroxybutyric acid ("GHB") or one of its analogues, gamma butyrolactone ("GBL"). (PRDJSF ¶ 8; Defs' Joint Statement of Material Facts ("DJSMF"), ¶¶ 16–17, Dkt. No. 126.) Both Pogodzinski and Tachaba, as well as Ninous's brothers Zaia and Bilous Zomaia, grew increasingly concerned about Ninous's consumption of Liquid G, especially after he was hospitalized at least twice after using Liquid G, and his cousin, Rami Zomaia, passed away from a drug overdose. (PRDJSF ¶¶ 8–10.) According to Pogodzinski, Ninous's family was convinced that he was responsible for Rami's death and sought to keep Ninous separated from him. (*Id.* ¶¶ 9–10.) Pogodzinski also claims that Zaia sought to leverage his friendship with Defendant Iwanski, a Skokie police officer, to accomplish that end. (*Id.* ¶¶ 25, 73.)[1] Iwanski disputes this, however, and testified that he has never met or spoken with Zaia. (Defs.' Joint Resp. to Pl.'s Statement of Add. Facts ("DJRPSAF"), ¶ 73, Dkt. No. 145; DJSMF, Ex. 9, Iwanski Dep. Tr. 60:8–14.)

All parties agree, however, that several weeks before Pogodzinski was arrested, Zaia, Bilous, and Tachaba met with police. (PRDJSF ¶ 10.) The officers did not introduce themselves, although Defendant Gutierrez, a sergeant with the Illinois State Police and member of the Illinois State Police Narcotics and Currency Interdiction Task Force ("NARCINT"), was present. (*Id.* ¶¶ 10–11.) At the meeting, Zaia, Bilous, and Tachaba relayed their concerns about Ninous's drug

---

[1] The only evidence Pogodzinski provides to support this assertion is his own testimony (PRDJSF ¶ 73; Pogodzinski Dep. Tr. 193:14–194:24) and that of Ninous, who testified that Zaia once told him that he worked with an officer, who Ninous recalled was Iwanski, to have Pogodzinski arrested. (PRDJSF ¶ 73; PRDJSF, Ex. 7, Zomaia Dep. Tr. 85:10–86:7, 88:16–89:5.)

2

use, and Tachaba informed police that Pogodzinski supplying Ninous with Liquid G. (*Id.* ¶ 10, 15.)

On April 8, 2014, Pogodzinski came to visit Ninous and Tachaba at their apartment in Skokie. (*Id.* ¶ 6.) Pogodzinski brought with him jugs of 1,4 Butanediol ("BD"), an industrial chemical that is also an analogue of GHB, which he claims was intended to be used in a polyaspartic flooring job on which he had recently begun to work. (PRDJSF ¶¶ 7, 17; DJSMF ¶ 17.) On April 10, 2014, Ninous and Pogodzinski argued after Ninous attempted to access an unsealed jug of BD while under the influence and, in response, Pogodzinski dumped the contents into a toilet. (PRDJSF ¶ 21.) Tachaba joined the argument, which became physical, and she ultimately left the apartment to stay with Ninous's parents and brother. (*Id.* ¶¶ 22–23.) The next day, on April 11, 2014, police officers picked up Tachaba at her work and took her to the courthouse in Skokie to file a domestic violence report. (*Id.* ¶¶ 25, 74.) Tachaba recognized one of the officers as a participant in the meeting a few weeks earlier. (*Id.*)

That same day, Gutierrez prepared an application for a search warrant based on Tachaba's statements. (*Id.* ¶ 29.) Although Pogodzinski disputes whether Tachaba provided certain details that were included in the affidavit, such as the price at which he allegedly sold Liquid G, he does not dispute the substance of the affidavit; namely, that Tachaba communicated to Gutierrez that she believed Pogodzinski, who was currently staying with her, was selling Liquid G.[2] (PRDJSF ¶¶ 26–28; DJSMF ¶¶ 26–28.) Specifically, Pogodzinski provides no evidence to dispute that Tachaba told Gutierrez that Pogodzinski was presently at her apartment with a gallon of Liquid G, that she had observed Pogodzinski pouring out Liquid G that Ninous would then sell, or that she

---

[2] Pogodzinski disputes that Tachaba spoke to Gutierrez about his possession of Liquid G on the grounds that he never possessed Liquid G but instead possessed BD.

3

had seen Pogodzinski with large quantities of cash.[3] (PRDJSF ¶ 28.) The warrant application did not mention that Gutierrez had previously met with Tachaba. (DJRPSAF ¶ 79.) Finally, Gutierrez brought Tachaba in front of a judge to support the application for a search warrant. (DJSMF ¶ 29; PRDJSF ¶ 29.) Tachaba testified that Pogodzinski was selling Liquid G and providing it to Ninous. (DJSMF ¶ 29; PRDJSF ¶ 29.) The judge granted the search warrant. (PRDJSF ¶ 30.)

While compiling the search warrant, Gutierrez telephoned Inspector Anthony Anderson, a Morton Grove police officer assigned full-time to NARCINT. (*Id.* ¶¶ 13, 31.) Anderson had substantial training in narcotics interdiction and the identification of so-called "designer" drugs. (*Id.* ¶ 14.) After Gutierrez requested that Anderson telephone a member of the Skokie Police Department to inform them that a search warrant would be executed within the jurisdiction of Skokie, Anderson phoned Iwanski.[4] (*Id.* ¶¶ 32–33.)

On April 11, 2014, approximately eight officers, including Anderson, executed the search warrant. (*Id.* ¶ 34.) Pogodzinski was handcuffed during the search, although he does not know by whom, and he only saw Gutierrez and Iwanski inside the apartment roughly fifteen minutes after the first officers arrived and began to search the apartment. (*Id.* ¶¶ 36–37.) According to Pogodzinski, Iwanski mostly just stood around, although he eventually searched the kitchen. (*Id.*

---

[3] Again, although Pogodzinski generally denies the substance of Tachaba's statements to Gutierrez, in his own deposition he admits that Tachaba told him she was the affiant for the search warrant, that she had told police that he possessed GHB, that Ninous was selling it, and that she had seen Pogodzinski with large sums of cash. (DJSMF, Ex. 4, Pogodzinski Dep. Tr. 176:8 – 179:18.) Furthermore, while he disputes portions of the "Complaint for Search Warrant" prepared by Gutierrez that were hand-redacted in the version disclosed through Defendants' Rule 26(a) disclosures and unredacted in another version received with computer redactions, Pogodzinski provides no other basis for contesting the evidence than the existence of discrepancies between the redactions. (PRDJSF ¶ 28.)

[4] While Pogodzinski does not dispute that Gutierrez asked Anderson to call a Skokie police officer to give notice of the search warrant, he asserts there was no need to notify Iwanski because Iwanski was already aware of the investigation. In particular, he claims that Iwanski initiated the meeting between Gutierrez, Tachaba, Zaia, and Bilous. However, Pogodzinski points to no evidence in the record to support this contention.

4

¶ 38.) Similarly, Pogodzinski did not observe Gutierrez conducting a search but noted that he stood around "in a supervising way." (*Id.* ¶ 38.)

Shortly after Iwanski and Gutierrez arrived, an unknown officer carried a plastic milk jug containing a clear substance, along with several other small plastic and glass bottles, into the living room. (*Id.* ¶ 39.) Pogodzinski told officers that the jug contained BD, which he used for a flooring job. (*Id.* ¶¶ 39–40.) But when asked by an officer why the substance had been transferred to plastic bottles, rather than kept in industrial containers, Pogodzinski did not have a response. (DJSMF ¶ 40; PRDJSF ¶ 40.) Anderson performed a shake test on the contents of the jug to determine whether the substance had a thicker viscosity than water. (PRDJSF ¶¶ 42–44.) After conducting the test, Anderson formed an opinion that the substance was GHB, GBL, or BD. (DJSMF ¶ 46; PRDJSF ¶ 46.) Gutierrez and Anderson then questioned Pogodzinski about the substance that had been emptied out of another gallon jug. (PRDJSF ¶ 47.)

Pogodzinski was subsequently arrested for possession of GHB or GBL. (DJSMF ¶ 48; PRDJSF ¶ 48.) Iwanski is listed as the arresting officer on the police reports, although he disputes that he was involved in the arrests. (PRDJSF ¶¶ 48–49; DJSMF ¶ 48–49.) Iwanski also prepared a brief report detailing the execution of the search warrant, recording that "approximately 3,896 grams of liquid GBL (Gamma-Butyrolactone) were recovered from inside the apartment." (PRDJSF ¶ 51; DJSMF, Ex. 14, Skokie Police Rep. No. 14-03162.)

After transporting Pogodzinski to the Skokie Police Department and interviewing him further, the NARCINT team decided to charge Pogodzinski with unlawful possession of GBL. (DJSMF ¶¶ 52– 55, 58; PRDJSF ¶¶ 52–55, 58.) Gutierrez signed the criminal complaint charging

5

Pogodzinski with unlawful possession of GBL.[5] (DJSMF ¶ 61; PRDJSF ¶ 61.) Later, when asked what he believed the seized substance was, Gutierrez testified that he "didn't think it was [BD] at the time," but rather he "thought it was GHB . . . GBL, one of those two." (DJRPSAF ¶ 84; DJSMF, Ex. 7, Gutierrez Dep. Tr. 73:23–74:12.)

On April 13, 2014, a judge determined there was probable cause for Pogodzinski's arrest and set bail. (PRDJSF ¶ 65.) Pogodzinski posted bond on May 12, 2014. (*Id.* ¶ 66.) Testing of the substances found in the jugs and bottles conducted by the Illinois State Police Forensic Laboratory later confirmed that the substance was BD. (*Id.* ¶ 67.) The State subsequently dismissed the charges against Pogodzinski, although the record is silent as to the reason. (DJSMF ¶ 68; PRDJSF ¶ 68.) Defendants suggest the dismissal was the result of the exercise of prosecutorial discretion, as while Pogodzinski could have still been prosecuted for possession of BD as a controlled substance analogue, proving the case would require the use of an expert witness. (DJSMF ¶ 68); 720 ILCS 570/401. Pogodiznski disputes this explanation as an unfounded assumption. (PRDJSF ¶ 68.)

## DISCUSSION

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). And "[t]he moving party is 'entitled to a judgment as a matter of law' [where] the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When evaluating a motion for summary judgment, "the inferences to be drawn from the

---

[5] Although the text of the criminal complaint states that Pogodzinski was arrested for possession of GBL, which would violate 720 ILCS 570/401(a)(11), the complaint incorrectly cites 720 ILCS 570/401(a)(2), which covers possession of cocaine. This apparent mistake does not affect the Court's analysis.

underlying facts must be viewed in the light most favorable to the party opposing the motion." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). A court, however, need not "draw[] inferences that are supported by only speculation or conjecture." *Fitzgerald v. Santoro*, 707 F.3d 725, 730 (7th Cir. 2013).

Although Pogodzinski does not present his claims in separate counts, as noted in its previous denial of Iwanski's motion to dismiss, the Court discerns that he brings claims under 42 U.S.C. § 1983 for false arrest, unlawful pretrial detention, and conspiracy. (Dkt. No. 76.)

## I.  False Arrest

A false arrest claim requires a plaintiff to prove that he was arrested without probable cause in violation of the Fourth Amendment. *Brooks v. City of Chicago*, 564 F.3d 830, 832 (7th Cir. 2009). Thus, "[t]he existence of probable cause to arrest is an absolute defense to any § 1983 claim against a police officer for false arrest." *Abbot v. Sangamon County*, 705 F.3d 706, 713 (7th Cir. 2013). Courts apply an objective test to decide whether probable cause existed at the time of arrest. *Humphrey v. Staszak*, 148 F.3d 719, 726 (7th Cir. 1998). "A police officer has probable cause to arrest a person if, at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Gonzalez v. City of Elgin*, 578 F.3d 526, 537 (7th Cir. 2009) (quoting *Michigan v. DeFillippo*, 443 U.S. 31, 37 (1979)). Although "probable cause does not require evidence sufficient to support a conviction, it does demand more than a bare suspicion of criminal activity." *Henderson v. City of Chicago*, No. 14-cv-09905, 2019 WL 4824821, at *3 (N.D. Ill. Sep. 30, 2019) (citing *Holmes v. Village of Hoffman Estate*, 511 F.3d 673, 679 (7th Cir. 2007)). However, "probable cause is far short of certainty—it 'requires only a probability or substantial chance of

7

criminal activity, not an actual showing of such activity." *United States v. Seiver*, 692 F.3d 774, 77 (7th Cir. 2012) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). And, for false arrest claims, "[t]he crucial point of inquiry for a probable cause determination is what the Officers knew at the time of the arrest." *Murawski v. Reid*, 375 F. Supp. 3d 998, 1005 (N.D. Ill. 2019) (citing *Neita v. City of Chicago*, 830 F.3d 494, 497 (7th Cir. 2016)). Therefore, if probable cause existed at the time of his arrest, Pogodzinski is barred from proceeding on his claims. *Morfin v. City of East Chicago*, 349 F.3d 989, 997 (7th Cir. 2003).

Defendants contend that probable cause existed to arrest Pogodzinski for possession of GBL. Under Illinois law, "the elements of unlawful possession of a controlled substance with intent to deliver are: (1) the defendant had knowledge of the presence of the controlled substance, (2) the drugs were in the immediate possession or control of the defendant, and (3) the defendant intended to sell the drugs." *People v. Sherrod*, 916 N.E.2d 1256, 1258 (Ill. App. Ct. 2009) (citing 720 ILCS 570/501). Both GHB and GBL are controlled substances that are illegal under Illinois law. 720 ILCS 570/102(f); 720 ILCS 570/204(e)(3).

Viewing the evidence in the light most favorable to Pogodzinski, the Court concludes that no reasonable juror could find that it was unreasonable for an officer in Gutierrez's or Iwanski's position at the time of arrest to have believed that Pogodzinski possessed GBL with the intent to deliver. Put differently, the undisputed evidence establishes as a matter of law that the officers had probable cause. First, officers at the scene were executing a search warrant based on testimony by an eyewitness (Tachaba) that she had personal knowledge that Pogodzinski currently possessed a gallon of Liquid G, an unlawful substance, that he intended to sell. *See Jenkins v. Keating*, 147 F.3d 577, 585 (7th Cir. 1998) ("So long as a reasonably credible witness or victim informs the police that someone has committed, or is committing, a crime, the officers have probable cause.").

Moreover, the results of the search conducted at the apartment corroborated Tachaba's testimony. Once there, officers discovered plastic gallon jugs filled with a viscous substance. And officers discovered more of the substance in smaller plastic and glass bottles, corroborating Tachaba's statements that Pogodzinski was selling the Liquid G. Indeed, Inspector Anderson, an expert in drug identification, formulated an opinion based on the search that the substance in the jugs was likely GHB, GBL, or BD. Pogodzinski also admitted at the scene that the gallon jugs were his, and the officers did not need to trust his representation that the substance was BD used for flooring jobs. Taking all these facts together, no reasonably jury would be able to find a lack of probable cause for Pogodzinski's arrest.

Pogodzinski attempts to negate the existence of probable cause at the time of his arrest on several grounds.[6] First, he notes that the substance seized from the apartment was not actually GHB or GBL, but rather BD, a substance that could be possessed legally, implying that probable cause could not have existed at the time of his arrest because he did not possess the allegedly unlawful substance. But "the existence of probable cause turns on the information known to the officers at the moment the arrest is made, not on subsequently-received information." *Gower v. Vercler*, 377 F.3d 661, 668 (7th Cir. 2004) (internal quotation marks omitted). That the officers were ultimately wrong about the nature of the substance—or even that they did not have complete certainty as to its chemical composition—at the time of arrest simply does not, as Pogodzinski suggests, negate probable cause. Indeed, "the mere fact that the suspect is later acquitted of the offense for which he is arrested is irrelevant to the validity of the arrest." *DeFillippo*, 443 U.S. at 37.

---

[6] For purposes of this analysis, the Court assumes, but does not decide, that Gutierrez and Iwanski were personally responsible for the arrest.

The only evidence Pogodzinski offers to show that the officers on the scene could not have reasonably believed that the substance in the jugs was GHB or GBL are his own statements at the scene that the substance was BD. Yet "probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts." *District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018). And officers may weigh the credibility of a suspect's explanation in view of the entirety of the situation. *See United States v. Funches*, 327 F.3d 582, 587 (7th Cir. 2003) (describing how "the mere existence of innocent explanations does not necessarily negate probable cause," and finding that probable cause existed when other elements of the situation made those explanations unlikely). Here, Pogodzinski's statements that the substance in the jugs was BD possessed solely for use in a flooring project must be considered in context. Specifically, an officer at the scene would have considered that they were executing a warrant to search for GHB or GBL being prepared for sale, and the substance they found was not in an industrial cannister but in gallon jugs and numerous smaller bottles as if being prepared for sale. In this situation, a reasonable officer could find that Pogodzinki's explanations were not believable.

Pogodzinski next contends that Tachaba's testimony, and the search warrant based upon it, cannot be used to support a finding of probable cause for the arrest. First, he claims that Gutierrez did not mention that he had done no independent police work to corroborate Tachaba's statements when applying for the search warrant. But an affidavit alone can support a probable-cause finding for a search-warrant application if, "based on the totality of the circumstances, the affidavit sets forth sufficient evidence to induce a reasonably prudent person to believe that a search will uncover evidence of a crime." *United States v. Peck*, 317 F.3d 754, 755–56 (7th Cir. 2003). Here, the officers had Tachaba's affidavit and live testimony that Pogodzinski was currently present at her apartment with a gallon of Liquid G that he was planning to sell. *See London v. Guzman*, 26 F.

10

Supp. 3d 746, 754 (N.D. Ill. 2014) (finding probable cause existed in part due to the affidavit of a confidential informant supporting the search warrant officers were executing).

Next, Pogodzinski makes much of the fact that Gutierrez did not disclose in his application for a search warrant that he had previously met with Tachaba or that this was her first time serving as a confidential source. Yet "a warrant request violates the Fourth Amendment only if the requesting officer knowingly, intentionally, or with reckless disregard for the truth, makes false statements in requesting the warrant and the false statements were necessary to the determination that a warrant should issue." *Id.* at 752 (quoting *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012)). And Pogodzinski provides no basis for the Court to conclude that Gutierrez's failure to disclose the prior meeting rendered the statements in the warrant application false. Indeed, the record demonstrates that Tachaba consistently and truthfully communicated to Gutierrez the allegations contained in the affidavit; specifically, that Pogodzinski was selling Liquid G. In fact, by Pogodzinski's own account, Tachaba, Zaia, and Bilous were all concerned about Ninous's drug use and genuinely, if in his view mistakenly, believed Pogodzinski was involved in supplying those drugs. Pogodzinski may dispute the accuracy of Tachaba's accounts (as he claims he possessed BD and not Liquid G), but even he admits that Tachaba testified truthfully. In sum, it was reasonable for the officers to rely on the search warrant, and Tachaba's statements contained therein, when determining whether probable cause existed at the time of arrest.

Pogodzinski claims that probable cause could not have existed at the time of his arrest because, according to him, both Gutierrez and Iwanski, together with Ninous's family, wanted to arrest him regardless of whether he was actually selling Liquid G. But "probable cause to arrest is an absolute defense . . . even where the defendant officers allegedly acted upon a malicious

11

motive." *Mustafa v. City of Chicago*, 442 F.3d 544, 547 (7th Cir. 2006); *see also Schertz v. Waupaca County*, 875 F.2d 578, 582 (7th Cir. 1989) ("[R]egardless of the defendants' motives toward the plaintiff, the existence of probable cause for arrest is an absolute bar to a Section 1983 claim for unlawful arrest [or] false imprisonment."). Therefore, whether Gutierrez and Iwanski were looking for an excuse to arrest Pogodzinski is irrelevant for purposes of determining the existence of probable cause.

In sum, because no reasonable juror could find that, given the facts known to an officer at the time of arrest, probable cause did not exist, Pogodzinski's claims for false arrest are barred.

## II. Unlawful Detention

Similar to a claim for false arrest, a claim for unlawful pretrial detention "rests on the fundamental Fourth Amendment principle that a pretrial detention is a 'seizure'—both ***before*** formal legal process and ***after***—and is justified only on probable cause." *Lewis v. City of Chicago*, 914 F.3d 472, 476–77 (7th Cir. 2019) (citing *Manuel v. City of Joilet*, 137 S. Ct. 911, 918 (2017)). Judicial determinations of probable cause are presumed valid, although "falsifying the factual basis for a judicial probable-cause determination violates the Fourth Amendment." *Lewis*, 914 F.3d at 477. Pogodzinski raises the same arguments against the existence of probable cause with regards to his claims for unlawful detention as he does for his claims for false arrest. For the reasons given above, those fail.

In addition, Pogodzinski contends that both Gutierrez and Iwanski falsified evidence that caused his unlawful detention by submitting paperwork to a judge indicating that Pogodzinski possessed GBL. Specifically, Gutierrez attested to the accuracy of and signed the criminal complaint charging Pogodzinski with possession of GBL, while Iwanski wrote that officers had recovered "approximately 3,896 grams of liquid GBL (Gamma-Butyrolactone) . . . from inside the

apartment." (DJSMF, Ex. 14, Skokie Police Rep. No. 14-03162.) Again, Pogodzinski's argument rests on the theory that because he accurately informed the police that the substance in the jugs was BD, not GHB or GBL, any reports indicating otherwise were necessarily falsified. But neither Gutierrez nor Iwanski was required to accept Pogodzinski's statements at face value, and Pogodzinski provides no other basis from which to infer that either Defendant knew that the substance found was not actually GBL. Thus, Pogodzinski's claims for unlawful detention fail due to the existence of probable cause and the lack of evidence that Guitierrez or Iwanski falsified any evidence used to deprive him of his liberty.

### III. Conspiracy

Pogodzinski also asserts a § 1983 conspiracy claim against both Gutierrez and Iwanski, claiming that they conspired with each other and Ninous's family to falsely arrest him. To establish § 1983 liability through a conspiracy, a plaintiff must establish that (1) the defendants reached an agreement to deprive the plaintiffs of his constitutional rights, and (2) overt acts in furtherance of the conspiracy that actually deprived the plaintiffs of those rights. *Beaman v. Freesmeyer*, 776 F.3d 500, 510 (7th Cir. 2015). Notably, "conspiracy is not an independent basis of liability in Section 1983 actions." *Smith v. Gomez*, 550 F.3d 613, 617 (7th Cir. 2008). As discussed above, the Court has granted summary judgment in favor of Gutierrez and Iwanski on the claims alleging substantive constitutional violations for false arrest and unlawful detention. Therefore, Pogodzinski cannot establish a conspiracy claim against either Gutierrez or Iwanski based on those alleged constitutional violations.

But what is more, Pogodzinski has failed to provide any evidence from which a reasonable jury could infer the existence of an agreement to falsely arrest and unlawfully detain him. The only evidence Pogodzinski provides of any agreement between Gutierrez, Iwanski, and Ninous's

13

family is Ninous's testimony that Zaia once told him that he worked with Iwanski to have Pogodzinski arrested. Setting aside the issue of Ninous's credibility, as well as the issue of hearsay, nothing in that statement indicates that any resulting arrest would be unlawful or that there was a plan to frame Pogodzinski. Instead, the statement is wholly consistent with Ninous's family being concerned about his wellbeing, especially in light of his cousin's death from a drug overdose, and seeking help from the police regarding those concerns.

Finally, nothing in the record provides support for a link between Iwanski and Gutierrez regarding Pogodzinski. Pogodzinski repeatedly claims that the two law enforcement officers worked together to orchestrate his arrest, yet he points to no conversations between the two officers, no testimony from Tachaba, Zaia, or Bilous to that effect, and nothing else from which a jury could infer that the two Defendants were participating in a joint activity. At the summary judgment stage, a party must provide proof to support his claims. With regard to his claims of conspiracy, Pogodzinski has failed to do so.

### IV.    Personal Involvement

Iwanski also moves for summary judgment on the grounds that he had no personal involvement in either Pogodzinski's arrest or his unlawful detention. Because the existence of probable cause to arrest and detain Pogodzinski bars his claims, the Court need not address this issue.

14

## CONCLUSION

For the reasons discussed above, the Court grants Gutierrez's and Iwanski's motions for summary judgment. (Dkt. Nos. 122, 124.)

ENTERED:

Dated: September 30, 2021

Andrea R. Wood
United States District Judge